## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CHARLOTTE CRAFT,

        Plaintiff,

v.

FLORIDA DEPARTMENT OF CORRECTIONS, an agency of the State of Florida, the SOUTH FLORIDA RECEPTION CENTER, an entity of the State of Florida, DONNELL EPPS, (Individually, and in his official capacity as a Correctional Officer for the FDC), and AKILAH DESHAZIOR, (Individually, and in her official capacity as a Lieutenant for the FDC).

        Defendants.

Case No. 1:21-cv-23184
**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff Charlotte Craft ("**Plaintiff** or "**Ms. Craft**"), by her undersigned counsel, Derek Smith Law Group, PLLC, hereby complains of Defendant Florida Department of Corrections ("**FDC**"), Defendant South Florida Reception Center ("**Detention Center**"), Defendant Donnell Epps, ("**Defendant Epps**"), individually, and in his official capacity as "Correctional Officer," and Defendant Akilah DeShazior ("**Defendant DeShazior**"), individually, and in her official capacity as "Lieutenant," (collectively "**Defendants**"), and alleges as follows:

## INTRODUCTION

1.    This case is about a service member whose state employer subjected her to the most hostile work environment she has ever experienced.

2.    Ms. Craft brings this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("**Title VII**"), the Florida Civil Rights Act of 1992,

§760.01, *et seq.*, Florida Statutes ("**FCRA**"), the Uniformed Services Employment and Reemployment Rights Act of 1994, 38 U.S.C. § 4301, *et seq.* ("**USERRA**") and, 42 U.S.C. § 1983 (**"§ 1983"**).

3.     Plaintiff seeks monetary relief to redress Defendant's unlawful employment practices in violation of Title VII, the FCRA, USERRA, and her Fourteenth Amendment Equal Protection Rights for intentional discrimination because of her sex.  Additionally, this action seeks to redress Defendants' deprivation of Plaintiff's personal liberty and her civil right to pursue an equal employment opportunity in a workplace free from unlawful discrimination.  Finally, this action seeks to redress Defendant Epps' torts committed against Plaintiff.

## JURISDICTION AND VENUE

4.     The Court has jurisdiction over this action under 28 U.S.C. §§ 1331 (federal questions) and 1343(a)(3) (civil rights), 42 U.S.S. §2000e-5(f)(3) (Title VII), 38 U.S.C. § 4323(b)(3) (USSERA), and §1367 (supplemental jurisdiction).

5.     Venue is proper in the Southern District of Florida under 42 U.S.C. § 20003-5(f)(3), 28 U.S.C. § 1391(b), and 38 U.S.C. § 4323(c)(1) because a substantial portion of the acts or omissions giving rise to this action occurred in the Southern District of Florida.

## PARTIES

6.      Plaintiff Charlotte Craft is an individual woman residing in Miami-Dade County, Florida.

7.     Plaintiff is expressly authorized to bring this action by Sections 706(f)(1) and (3) of Title VII, 42 U.S.C. §§ 2000e-5(f)(1) and (3), 38 U.S.C. § 4323(a)(3)(A-B), and impliedly authorized to bring this action under 42 U.S.C. § 1983.

8.      Defendant Florida Department of Corrections is a governmental entity and political subdivision of the State of Florida, established pursuant to the laws of Florida.  Defendant FDC is one of the largest state prison systems in the United States.

9.      Defendant FDC is an "employer" within the meaning of 42 U.S.C. § 2000e(b), FCRA § 760.02(7), and 38 U.S.C. § 4323(a), and Defendant FDC is a "person" within the meaning of 42 U.S.C. § 2000e(a), 42 U.S.C. § 1983, and FCRA § 760.02(6).  Defendant FDC is subject to suit under USERRA under 38 U.S.C. § 4323(a).

10.     Defendant South Florida Reception Center is a governmental body established pursuant to the laws of Florida and is located within this judicial district.

11.     Defendant SFRC is an "employer" within the meaning of 42 U.S.C. § 2000e(b), FCRA § 760.02(7), and 38 U.S.C. § 4323(a), and Defendant SFRC is a "person" within the meaning of 42 U.S.C. § 2000e(a), 42 U.S.C. § 1983, and FCRA § 760.02(6).  Defendant SFRC is subject to suit under USERRA under 38 U.S.C. § 4323(a).

12.     At all material times, Plaintiff was jointly employed by the Florida Department of Corrections and the South Florida Reception Center.

13.     Defendant Donnell Epps ("**Mr. Epps**") is an individual man believed to be residing in Miami-Dade County, Florida.  Defendant Epps is employed by the Florida Department of Corrections as a "Correctional Officer."

14.     Defendant Akilah DeShazior ("**Ms. DeShazior**") is an individual woman believed to be residing in Miami-Dade County, Florida.  Defendant DeShazior is employed by the Florida Department of Corrections employed as a "Lieutenant."  Ms. DeShazior held direct supervisory authority over Ms. Craft, controlling various terms and conditions of her employment.

## ADMINISTRATIVE PREREQUISITES

15.     Plaintiff has complied with all administrative requirements.

16.     On or about April 3, 2020, Plaintiff timely dual-filed a charge of discrimination (Charge No. 510-2020-02384) with the U.S. Equal Employment Opportunity Commission ("**EEOC**"), and the Florida Commission on Human Relations ("**FCHR**"), naming Florida Department of Corrections and the South Florida Reception Center as the Respondents.

17.     On or about May 24, 2021, the EEOC forwarded Plaintiff's right to sue request to the U.S. Department of Justice ("**DOJ**").

18.     On or about June 15, 2021, the DOJ issued a right to sue notice.

19.     This Complaint was timely filed within 90 days of the DOJ's notice of Plaintiff's suit rights.

## FACTUAL ALLEGATIONS

20.     Ms. Craft is a thirty-year-old woman, and a member of the United States Army National Guard.

21.     The Florida Department of Corrections began employing Plaintiff as a "Correctional Officer" at the South Florida Reception Center on or about July 2, 2014.  The Detention Center assigned Plaintiff to work at the Larkin Community Hospital (the "**Hospital**"). Ms. Craft transported inmates to and from medical appointments and emergencies.  Ms. Craft worked alongside a team of 5-6 correctional officers from 7 A.M. to 7 P.M., daily.

### Defendants Subject Plaintiff to a Hostile Work Environment Because of Her Sex

22.     In or around January of 2019, the Florida Department of Corrections began subjecting Ms. Craft to a hostile work environment because of her sex.

23.     Throughout the Spring of 2019, Mr. Epps began making unwanted sexual advances toward Ms. Craft over her objection.  For example, Mr. Epps told Ms. Craft, "I cheat on my girlfriend all the time," and then indicated his desire to have a sexual relationship with Ms. Craft. When Ms. Craft made clear that she had a boyfriend and was not interested—especially because Mr. Epps was a coworker—Ms. Epps only increased his sexual harassment.

24.     Mr. Epps would pick Ms. Craft in the sallyport, saying, "I want to show others how strong I am."  Mr. Epps did this on multiple occasions.  In the process, Mr. Epps would reach inside Ms. Craft's vest, attempting to grope and squeeze Plaintiff's breasts.  Ms. Craft grabbed Mr. Epps' hands and said, "Stop it—now."

25.     Mr. Epps, however, did not stop.  In fact, his sexual harassment of Ms. Craft only increased.  Indeed, in or around June of 2019, Mr. Epps grabbed Ms. Craft and forcefully pushed her into the breakroom on the 4th floor when no one was looking.  He shut the door, picked Ms. Craft up, and put her on a table.  Mr. Epps placed Ms. Craft in fear of unwanted, offensive sexual contact.  Mr. Epps approached Ms. Craft, trying to kiss Plaintiff against her will.  Ms. Craft said, "Stop it—seriously."  Mr. Epps backed off and existed the breakroom, leaving Ms. Craft in disbelief, humiliation, and emotionally distressed that her co-worker could treat her this way.

26.     Indeed, Ms. Craft always believed any harm would come from an inmate of the prison, not her coworkers—but she was wrong.  Mr. Epps continued making unwanted sexual advances, and harmful and offensive contact throughout Ms. Craft's employment.

27.     In or around July of 2019, Mr. Epps asked Ms. Craft to be in a music video to play Mr. Epps's girlfriend.  Once again, Ms. Craft told Mr. Epps she was uninterested.  Ms. Craft reiterated that she had a boyfriend, and she was not interested in indulging Mr. Epps's sexual fantasies about Ms. Craft.

28.     On or about January 28, 2020, Mr. Epps sexually assaulted Ms. Craft at work.

29.     Mr. Epps pulled Ms. Craft into room 318, an empty hospital room without surveillance cameras.  Mr. Epps shut the door, unzipped his pants, and said, "Do me a favor, Craft." Ms. Craft stood up and tried to leave.  Then Mr. Epps grabbed Ms. Craft's wrists, pushed her into a corner and tried to kiss her. Ms. Craft said, "Get off of me, Epps."  He would not.  "I said, do me a favor, Craft."  Ms. Craft said, "Epps, serious, stop!"  He did not stop.  Instead, Mr. Epps grabbed Ms. Craft's wrists tighter and moved his head near Ms. Craft's neck.  Ms. Craft said, "Epps, I'm serious, let me go right now!"  Ms. Craft was terrified.  She feared Mr. Epps was going to rape her.  Ms. Craft was so restrained she had to bend Mr. Epps' thumb back from around her wrist to escape, a release tactic Ms. Craft learned as a trainee correctional officer.

**Defendants Retaliate Against Plaintiff Following Sexual Harassment Complaints**

30.     Shortly Mr. Epps attacked Plaintiff, Ms. Craft text messaged Daniel Jimenez ("**Mr. Jimenez**"), a former correctional officer at an FDC facility in Okeechobee.  Ms. Craft explained that she wanted to report Mr. Epps but was concerned about the repercussions of doing so because of Mr. Epps' relationship with the other correctional officers, especially Ms. DeShazior.

31.     Indeed, Mr. Epps made sexual comments to Ms. DeShazior, except she rewarded Mr. Epps because Ms. DeShazior liked when Mr. Epps made sexual comments to her. Consequently, Ms. DeShazior protected Mr. Epps and treated him better than Ms. Craft.

32.     Ms. Craft then text messaged Zuleyka Ballate ("**Ms. Ballate**"), a correctional officer who worked alongside Ms. Craft at the Hospital.  Ms. Craft explained the entire event.

33.     On or about January 31, 2020, at about 4 P.M., Ms. Craft complained to Ms. DeShazior about Mr. Epps's attack.  Ms. Craft approached Ms. DeShazior's office and said, "Can I talk to you about an incident that happened?"  Ms. DeShazior made clear she was not interested

in helping Ms. Craft.  Indeed, Ms. DeShazior rolled her eyes, and said, "*What*, Craft?"  Ms. Craft explained Mr. Epps's attack verbatim, as described above.

34.     Ms. DeShazior—Plaintiff's supervisor—said, "Well what do you want *me* to do about it?  Bring him in here so you two can talk?"  Ms. Craft was taken aback.  "No," she said.  "Of course not."  Ms. Craft never wanted to interact with Mr. Epps again.  Annoyed, Ms. DeShazior said, "Then I guess I'll have to report it as sexual harassment.  But it's 4:30, and I don't know if anyone will be there."

35.     Ms. Craft insisted that Ms. DeShazior report the incident to the Detention Center over Ms. DeShazior's reluctance to be involved.  The Assistant Warden, Sara Zamora-Baldridge ("Ms. Zamora-baldridge") was in fact "there," and transferred Ms. DeShazior to the Detention Center's Warden, Francisco Acosta ("**Mr. Acosta**").  Mr. Acosta spoke to Ms. Craft directly.  He told her to file an incident report and arranged a meeting between Ms. Craft and Ms. Zamora-Baldrige for the following Monday.  Mr. Acosta also said that Mr. Epps and Ms. Craft would be separated.

36.     After the phone call, Ms. DeShazior told Ms. Craft that Mr. Epps would be special assigned to the Detention Center, and Ms. Craft will remain at the Hospital.

37.     Thirty-minutes later, however, Latessa Dixon (**Ms. Dixon**), the Detention Center's "Control Room Officer" assigned Mr. Epps to escort an inmate with Ms. Craft alone.  Ms. Dixon was aware of Ms. Craft's complaint regarding Mr. Epps.  Ms. Craft said, "Why do I have to go with him?  I was told he would be transferred."  Ms. Dixon said, "You two are the only available officers, and the inmate needs to go the ICU now."  Following Ms. Craft's complaint about Mr. Epps, Ms. Dixon—who was once friendly with Ms. Craft—stopped speaking to Ms. Craft.  Indeed,

the only thing she would say to Ms. Craft was comment about, "a white girl trying to get a black male in trouble."

38. Similarly, Ms. DeShazior was also aware of Ms. Craft's assignment with Mr. Epps yet took no action to stop it notwithstanding Ms. Craft's objection.

39. On or about February 1 and February 2, 2020, Ms. Craft worked at the Hospital's ICU.

40. On or about February 3, 2020, Ms. Craft met with Ms. Zamora-Baldridge. An hour after the meeting was scheduled, Ms. Zamora-Baldridge redirected Ms. Craft to Crystal Hall ("**Ms. Hall**"), the Detention Center's Human Resources officer. Ms. Craft explained the entire situation to Ms. Hall over a two-hour meeting. Ms. Craft was not paid for this time even though Defendant FDC order Plaintiff there on her day off.

41. Ms. Craft's co-workers began isolating Ms. Craft following her complaints about Mr. Epps. Indeed, even the co-workers Ms. Craft confided to about Mr. Epps harassment told Ms. Craft they "know nothing."

42. Around this time, Defendant FDC and Defendant SFRC began depriving Ms. Craft of work benefits she had before she complained about sexual harassment. For example, her supervisors would ordinarily provide Ms. Craft with advanced notice if she was needed for overtime. However, following Ms. Craft's sexual harassment complaints, her supervisors scheduled Ms. Craft for overtime with no notice. For instance, on or about February 7, 2020, Ms. Craft was not relieved from her shift until 11 P.M., resulting in a 16-hour shift.

43. Similarly, on or about February 14, 2020, Ms. Craft did not receive relief when she repeatedly requested leave for lunch.

44.     To be sure, even Ms. Craft's coworkers would call the control room to report that Ms. Craft was relieved from her shift, but in fact was not.  Consequently, Ms. Craft had to stay for hours beyond her scheduled shift at the behest of her supervisors and coworkers who resented and discriminated against Ms. Craft following her complaints about Mr. Epps.

45.     Ms. Craft's supervisors and coworkers began harassing Ms. Craft about her complaints.  On or about February 10, 2020, Mr. Ruiz told Ms. Craft, "Two females are saying you can't be in the back by yourself because someone might touch you and you'd report it!"  Similarly, Ms. Craft overheard another sergeant say things like, "Craft wrote Epps up for some bullshit."

46.     On or about February 15, 2020, one coworker hugged another in front of Ms. Craft, and mocked Plaintiff saying, "Don't touch me … don't touch me!"  attempting to humiliate Ms. Craft.

47.     In or around March of 2020, Sergeant Simmons called Ms. Craft at 4:00 A.M.  He raised his voice, and said, "Craft, you need to report to the main unit today."  Ms. Craft, taken aback said, "I'm not supposed to work there because Epps is there."  Mr. Simmons—who was aware of Plaintiff's complaints about Epps—said, "That doesn't matter.  You have to go."  Ms. Craft said that Defendant FDC and Defendant SFRC promised that she would not have to work with Epps again.  She said, "Can't someone else go?  I'm scared of him."  Mr. Simmons said, "No."  did not care.  He said, "You have to go."

48.     On or about March 9, 2020, Ms. DeShazior reprimanded Ms. Craft for "wearing false eyelashes on duty," even though Ms. Craft had worn eyelash extensions for two years.

**Defendants Discriminate and Retaliate Against Plaintiff Because of Her Military Status**

49.    Ms. Craft is an active member of the Army National Guard of the United States Military.  Yet, Defendants insisted on discriminating and retaliating against Plaintiff because of her military status.

50.    The National Guard provided Ms. Craft with her annual schedule in or around October of every year.  Ms. Craft provided Ms. DeShazior with her annual schedule as soon as she would receive the documents from the National Guard.

51.    However, the National Guard also requires periodic trainings, issued by periodic military orders.  Although Ms. Craft would receive these orders with little notice, Plaintiff always apprised Ms. DeShazior of her upcoming leave immediately.

52.    For example, on or about March 13, 2020, Ms. Craft received a Military Order for "active duty for training ("ADT") for March 13, 2020 to March 15, 2020.  Ms. Craft was called for training to assist local and state law enforcement during operations amid COVID-19.

53.    On or about June 9, 2020, Ms. Craft received a Military Order for "Full Time National Guard Duty" for June 1, 2020 to September 30, 2020.

54.    On or about September 29, 2020, Ms. Craft received a Military Order for "Full Time National Guard Duty" from October 1, 2020 to December 31, 2020.

55.    Ms. DeShazior purposefully applied incorrect codes on Ms. Craft's military leave payroll forms so Ms. Craft's leave would be taken out of her annual leave time rather than military leave, having no affect on her employment as required by USERRA.

56.    On other occasions, Plaintiff would work overtime—involuntarily—and Defendant FDC did not pay Plaintiff because she had to attend military trainings during that month. Specifically, as a service member, Ms. Craft had a bank of 240 hours of military leave for training.

Plaintiff's hours would be depleted whenever she had leave for a weekend periodic training. However, Ms. DeShazior would make any overtime hours Plaintiff worked for FDC from her military training hours. Consequently, Plaintiff only ever received two overtime paychecks in the five years she worked for Defendant FDC and Defendant SFRC.

57.    Ms. DeShaziors' discriminatory animus for Ms. Craft's military status is also evident by how she would discuss Ms. Craft's service. For instance, Ms. DeShazior would reduce Plaintiff's military trainings to "excuses" to miss work. Similarly, Ms. Deshazior would scrutinize Ms. Craft and question whether her military leave was legitimate even though Ms. Craft had been taking annual and intermittent military leave for at least 5 years. Similarly, Ms. DeShazior would reveal her animus for Ms. Craft's military status by telling Plaintiff's non-military coworkers things like, "Craft's leaving for more *fake military leave*."

58.    Ms. DeShazior retaliated against Ms. Craft when she returned from her military trainings. For example, Ms. DeShazior assigned Ms. Craft to work in the Detention Center for an entire month upon returning from military trainings. Conversely, Ms. DeShazior did not assign similarly situated, non-military correctional officers. For example, Ms. DeShazior never assigned Mr. Epps, Ms. Dixon, Ms. Ballate, Officer Michael Torres ("Mr. Torres"), or Officer Shawn McKay ("Ms. McKay") to the Detention Center.

59.    Ms. DeShazior assigned Ms. Ballate, Ms. Dixon, and Ms. McKay to the Control Room, yet never assigned Plaintiff to the Control Room despite her qualifications. Indeed, Ms. DeShazior would tell Plaintiff, "I'm not assigning you there because you're military."

60.    Ms. DeShazior intentionally assigned Ms. Craft less favorable assignments because of Plaintiff's military status.

61.     Ms. DeShazior also knew the Detention Center was more than 15 miles further than Ms. Craft's commute to the Hospital.  Early in the morning Plaintiff would meet her mother who would take Plaintiff's daughter to daycare.  Ms. DeShazior was aware of this and was also aware that assigning Plaintiff to the Detention Center would make Plaintiff's days far more difficult.

62.     Ms. DeShazior also knew the Detention Center assignments were more dangerous for Ms. Craft, yet assigned Plaintiff there anyways.  Indeed, on one occasion, after Ms. Craft had a run-in with supposed members of the Latin Kings, Ms. Craft asked Ms. DeShazior to assign Ms. Craft to a different annex of the Detention Center.  However, Ms. DeShazior laughed at Ms. Craft and said, "You're in the Army, you should be trained to fight Latin Kings."

63.     On or about March 25, 2021, Ms. Craft received a Military Order for January 1, 2021 to September 30, 2021.

64.     The above are just some of the examples of unlawful discrimination and retaliation Defendants subjected Plaintiff to on a repeated and ongoing basis.

65.     Defendants unlawfully discriminated against Plaintiff because of her sex and military status and because she complained and opposed discrimination and retaliation based on her sex and military status.

66.     Plaintiff claims a continuous practice of discrimination and claims that Defendants are subjecting her to continuing violations and makes all claims herein under the continuing violations doctrine.

67.     Plaintiff claims constructive and/or actual discharge to the extent Plaintiff is terminated from her position as a result of the herein detailed unlawful discrimination and retaliation.

68.     Plaintiff further claims aggravation, activation, and/or exacerbation of any preexisting conditions.

69.     As a result of Defendants' unlawful conduct, Plaintiff has suffered damages, including but not limited to financial and economic damages, lost wages (back pay and front pay) and benefits, advancement opportunities with Defendant, and continues to suffer the same.

70.     Plaintiff has also suffered emotional distress, mental anguish, loss of personal dignity, and other intangible damages.

71.     At bottom, Defendant FDC and SFRC are liable for depriving Plaintiff of her personal dignity and her civil right to pursue an equal employment opportunity in a work environment free from unrelenting discrimination, harassment, and retaliation.

## CAUSES OF ACTION

### COUNT I
### Title VII, 42 U.S.C. § 2000e-2(a)
### Hostile Work Environment – Sex
### (Against Defendants FDC and SFRC)

72.     Plaintiff reincorporates the allegations in paragraphs 22-42.

73.     Title VII prohibits employment discrimination in an individual's terms, conditions, and privileges of employment because of the individual's sex.

74.     To establish a claim of hostile work environment sexual harassment, a plaintiff must show: (1) she is a protected class member, (2) she was subjected to unwelcome harassment, (3) the harassment was because of her sex, (4) the harassment was sufficiently severe and/or pervasive to alter the terms and conditions of employment, and (5) a basis for employer liability.

75.     First, Plaintiff is a woman and is therefore a protected class member.

76.     Second, Plaintiff was subject to unwelcome sexual harassment. Plaintiff opposed Mr. Epps' sexual advances and physical attacks each time Mr. Epps continued to perpetrate that

harassment.  At first, when Mr. Epps made sexual advances to Plaintiff by talking about how he cheated on his girlfriend all the time, and suggested he and Plaintiff should have a relationship, Plaintiff told Mr. Epps she had a boyfriend was that she was not interested in Mr. Epps.

77.     Plaintiff was subjected to unwanted sexual harassment during the Spring of 2019, when Mr. Epps would, at least on two separate occasions, lift Plaintiff off the ground and attempt to squeeze Plaintiff's breasts.  Plaintiff would try to wrestle herself away from Mr. Epps and tell him to stop immediately.

78.     Plaintiff was subjected to unwelcome harassment in or around June of 2019, when Mr. Epps pushed Plaintiff into room, lifted her onto a table, and tried to kiss Plaintiff against her will.  Plaintiff said, "Stop it—seriously."

79.     Plaintiff was again subjected to unwelcome harassment on or about January 28, 2020, when Mr. Epps pulled Plaintiff into room 318, unzipped his pants, and said, "Do me a favor, Craft."  Plaintiff offended and terrified for her life.  She said, "Get off me."  When Mr. Epps would not release Plaintiff, she said, "Epps, serious, stop!"  When he attempted to kiss Plaintiff against her will, and held Plaintiff by the wrists, Plaintiff said, "I'm serious, let me go right now!"  Hence, Plaintiff was subjected to unwelcome sexual harassment because of her sex.  Then, Defendant FDC and Defendant SFRC assigned Plaintiff to work with Epps less than an hour after she complained about his sexual attack.

80.     Third, the sexual harassment perpetrated by Mr. Epps against Plaintiff was sufficiently severe or pervasive to alter the terms and conditions of Plaintiff's employment. Indeed, Mr. Epps' two attacks on Plaintiff—during the Spring of 2019 and in January 2020—both were sufficiently severe to alter the terms and conditions of Plaintiff's employment because Plaintiff was subjected to sexual attacks at work in violation of FDC/SFRC policy.  Defendant

FDC and SFRC's subsequent assignment for Plaintiff to work with Epps altered the terms and conditions of her employment because Defendants promised Plaintiff a new condition of her employment was that she would no longer have to work with Epps.

81. Following Plaintiff's sexual harassment complaints, Plaintiff's supervisors scheduled Plaintiff for overtime with no notice even though FDC and SFRC policy required such notice. For instance, on or about February 7, 2020, Ms. Craft was not relieved from her shift until 11 P.M., resulting in a 16-hour shift. Similarly, on or about February 14, 2020, Ms. Craft did not receive relief when she repeatedly requested leave for lunch.

82. Following Plaintiff's complaints, her co-workers would humiliate Plaintiff, saying that she would report everyone for any little incident that Plaintiff may perceive as harassment. Moreover, Ms. DeShazior was reluctant even to initiate an investigation into Mr. Epps' conduct. Thus, the harassment was severe and/or pervasive to alter the terms and conditions of Plaintiff's employment.

83. Finally, a basis for employer liability exists because Plaintiff notify Defendant FDC and Defendant SFRC about Mr. Epps' sexual harassment. Defendant participated in an investigation and gave full statements and cooperated with the investigator. However, even after Plaintiff complained about Mr. Epps' Defendant SFRC and Defendant FDC assigned Plaintiff to work with Mr. Epps alone. Thus, Defendant FDC and Defendant SFRC knew or should have known about Mr. Epps' harassment because Plaintiff reported Mr. Epss' sexual conduct.

84. Defendants FDC and SFRC violated Title VII, 42 U.S.C. § 2000e-2(a) by discriminating against Plaintiff in the terms, conditions, and privileges of Plaintiff's employment.

85. As an actual and proximate result of Defendants' unlawful employment practices in violation of Title VII, Plaintiff has suffered damages.

**COUNT II**
**FCRA § 760.10(1)(a)**
**Hostile Work Environment – Sex**
**(Against Defendants FDC and SFRC)**

86.     Plaintiff reincorporates the allegations in paragraphs 22-42.

87.     FCRA § 760.10(1)(a) prohibits employment discrimination in an individual's terms, conditions, and privileges of employment because of the individual's sex.

88.     First, Plaintiff is a woman and is therefore a protected class member.

89.     Second, Plaintiff was subject to unwelcome sexual harassment.  Plaintiff opposed Mr. Epps' sexual advances and physical attacks each time Mr. Epps continued to perpetrate that harassment.  At first, when Mr. Epps made sexual advances to Plaintiff by talking about how he cheated on his girlfriend all the time, and suggested he and Plaintiff should have a relationship, Plaintiff told Mr. Epps she had a boyfriend was that she was not interested in Mr. Epps.

90.     Plaintiff was subjected to unwanted sexual harassment during the Spring of 2019, when Mr. Epps would, at least on two separate occasions, lift Plaintiff off the ground and attempt to squeeze Plaintiff's breasts.  Plaintiff would try to wrestle herself away from Mr. Epps and tell him to stop immediately.

91.     Plaintiff was subjected to unwelcome harassment in or around June of 2019, when Mr. Epps pushed Plaintiff into room, lifted her onto a table, and tried to kiss Plaintiff against her will.  Plaintiff said, "Stop it—seriously."

92.     Plaintiff was again subjected to unwelcome harassment on or about January 28, 2020, when Mr. Epps pulled Plaintiff into room 318, unzipped his pants, and said, "Do me a favor, Craft."  Plaintiff offended and terrified for her life.  She said, "Get off me."  When Mr. Epps would not release Plaintiff, she said, "Epps, serious, stop!"  When he attempted to kiss Plaintiff against her will, and held Plaintiff by the wrists, Plaintiff said, "I'm serious, let me go right now!"  Hence,

Plaintiff was subjected to unwelcome sexual harassment because of her sex. Then, Defendant FDC and Defendant SFRC assigned Plaintiff to work with Epps less than an hour after she complained about his sexual attack.

93.     Third, the sexual harassment perpetrated by Mr. Epps against Plaintiff was sufficiently severe or pervasive to alter the terms and conditions of Plaintiff's employment. Indeed, Mr. Epps' two attacks on Plaintiff—during the Spring of 2019 and in January 2020—both were sufficiently severe to alter the terms and conditions of Plaintiff's employment because Plaintiff was subjected to sexual attacks at work in violation of FDC/SFRC policy. Defendant FDC and SFRC's subsequent assignment for Plaintiff to work with Epps altered the terms and conditions of her employment because Defendants promised Plaintiff a new condition of her employment was that she would no longer have to work with Epps.

94.     Following Plaintiff's sexual harassment complaints, Plaintiff's supervisors scheduled Plaintiff for overtime with no notice even though FDC and SFRC policy required such notice. For instance, on or about February 7, 2020, Ms. Craft was not relieved from her shift until 11 P.M., resulting in a 16-hour shift. Similarly, on or about February 14, 2020, Ms. Craft did not receive relief when she repeatedly requested leave for lunch.

95.     Following Plaintiff's complaints, her co-workers would humiliate Plaintiff, saying that she would report everyone for any little incident that Plaintiff may perceive as harassment. Moreover, Ms. DeShazior was reluctant even to initiate an investigation into Mr. Epps' conduct. Thus, the harassment was severe and/or pervasive to alter the terms and conditions of Plaintiff's employment.

96.     Finally, a basis for employer liability exists because Plaintiff notify Defendant FDC and Defendant SFRC about Mr. Epps' sexual harassment. Defendant participated in an

investigation and gave full statements and cooperated with the investigator.  However, even after Plaintiff complained about Mr. Epps' Defendant SFRC and Defendant FDC assigned Plaintiff to work with Mr. Epps alone.  Thus, Defendant FDC and Defendant SFRC knew or should have known about Mr. Epps' harassment because Plaintiff reported Mr. Epss' sexual conduct.

97.     Defendants violated FCRA § 760.10(1)(a) by discriminating against Plaintiff in the terms, conditions, and privileges of Plaintiff's employment because of her sex.

98.     As an actual and proximate result of Defendants' unlawful employment practices in violation of the FCRA, Plaintiff has suffered damages.

### COUNT III
### Title VII, 42 U.S.C. § 2000e-3(a)
### Retaliation
### (Against Defendants FDC and SFRC)

99.     Plaintiff reincorporates the allegations in paragraphs 22-47.

100.    An employer discriminates against an employee in violation of Title VII's anti-retaliation provision when the employer takes a materially adverse action against the employee because the employee engaged in protected activity.

101.    To establish a claim of retaliation, a plaintiff must show: (1) she engaged in protected activity, (2) she suffered a materially adverse action, and (3) a causal connection between the protected activity and the adverse action.

102.    First, Plaintiff engaged in protected activity when she complained, among other ways, to Mr. Epps directly.  Plaintiff engaged in protected activity by telling Mr. Epps she was not interested in a sexual relationship with him.  Plaintiff engaged in protected activity during the Spring of 2019 when she told Mr. Epps to put her down after he lifted her up against her will.  Plaintiff engaged in protected activity in or around June of 2019 when she opposed Mr. Epps' taking her into the break room, lifting her up on the table and attempting to kiss Plaintiff.  Plaintiff

engaged in protected activity on or about January 28, 2020 when she told Mr. Epps she did not want to perform oral sex on Mr. Epps. Plaintiff further engaged in protected activity when she filed a formal complaint about Mr. Epps' sexual harassment.

103. Second, Plaintiff suffered materially adverse actions sufficient dissuade a reasonable worker from complaining about sexual harassment. Plaintiff suffered a materially adverse action when Mr. Epps lifted Plaintiff and reached into her vest to grope her breasts after she told him she was not interested in a sexual relationship. Moreover, Epps subjected Plaintiff to more harassment after she opposed his previous sexual attacks. For example, after Plaintiff told Mr. Epps he did not want him to lift her up and reach inside her vest to grope her breasts, Mr. Epps engaged in the same activity a second time. Further, Plaintiff suffered a materially adverse action in June of 2019, when Mr. Epps attempted to kiss Plaintiff in the breakroom after Plaintiff told Mr. Epps to seriously stop and to get off of her. Plaintiff suffered a materially adverse action on or about January 28, 2020 when Mr. Epps unzipped his pants and asked Plaintiff to perform oral sex on him. Plaintiff suffered a materially adverse action when Defendant FDC and SFRC assigned Plaintiff to an assignment with Mr. Epps minutes after Plaintiff complained about Mr. Epps making sexual demands on Plaintiff.

104. The above-described actions would dissuade any reasonable worker from complaining about sexual harassment. Indeed, any reasonable worker would be dissuaded from complaining about sexual harassment if she knew she would be subjected to more, not less harassment. Further, any reasonable worker would be dissuaded from complaining about sexual harassment if she knew her employer would continue to assign the employee to work with the alleged harasser minutes after she complained.

105.    Third, Plaintiff's protected activity and her adverse actions are causally connected. Plaintiff's protected activity against Mr. Epps—complaining in Spring of 2019—is causally connected to his attack in June of 2019.  Then, Plaintiff's protected activity via an internal complaint and FDC and SFRC's adverse assignment of Plaintiff to work with Mr. Epps less than an hour later is causally connected based on temporal proximity.

106.    Defendants took the aforementioned adverse actions against Plaintiff because of his/her protected activities.

107.    As a result of Defendant FDC and Defendant SFRC's unlawful employment practices in violation of Title VII, § 2000e-3(a), Plaintiff has suffered damages.

**COUNT IV**
**FCRA § 760.10(7)**
**Retaliation**
**(Against Defendants FDC and SFRC)**

108.    Plaintiff reincorporates the allegations in paragraphs 22-47.

109.    An employer discriminates against an employee in violation of the FCRA's anti-retaliation provision when the employer takes a materially adverse action against the employee because the employee engaged in protected activity.

110.    First, Plaintiff engaged in protected activity when she complained, among other ways, to Mr. Epps directly.  Plaintiff engaged in protected activity by telling Mr. Epps she was not interested in a sexual relationship with him.  Plaintiff engaged in protected activity during the Spring of 2019 when she told Mr. Epps to put her down after he lifted her up against her will. Plaintiff engaged in protected activity in or around June of 2019 when she opposed Mr. Epps' taking her into the break room, lifting her up on the table and attempting to kiss Plaintiff.  Plaintiff engaged in protected activity on or about January 28, 2020 when she told Mr. Epps she did not

want to perform oral sex on Mr. Epps.  Plaintiff further engaged in protected activity when she filed a formal complaint about Mr. Epps' sexual harassment.

111.    Second, Plaintiff suffered materially adverse actions sufficient dissuade a reasonable worker from complaining about sexual harassment.  Plaintiff suffered a materially adverse action when Mr. Epps lifted Plaintiff and reached into her vest to grope her breasts after telling Epps she was not interested in having a sexual relationship with Epps.  Plaintiff suffered a materially adverse action when Mr. Epps subjected Plaintiff to more harassment after she opposed his previous sexual attacks.  For example, after Plaintiff told Mr. Epps he did not want him to lift her up and reach inside her vest to grope her breasts, Mr. Epps engaged in the same activity a second time.  Further, Plaintiff suffered a materially adverse action in June of 2019, when Mr. Epps attempted to kiss Plaintiff in the breakroom after Plaintiff told Mr. Epps to seriously stop and to get off of her.  Plaintiff suffered a materially adverse action on or about January 28, 2020 when Mr. Epps unzipped his pants and asked Plaintiff to perform oral sex on him.  Plaintiff suffered a materially adverse action when Defendant FDC and SFRC assigned Plaintiff to an assignment with Mr. Epps minutes after Plaintiff complained about Mr. Epps making sexual demands on Plaintiff.

112.    The above-described actions would dissuade any reasonable worker from complaining about sexual harassment.  Indeed, any reasonable worker would be dissuaded from complaining about sexual harassment if she knew she would be subjected to more, not less harassment.  Further, any reasonable worker would be dissuaded from complaining about sexual harassment if she knew her employer would continue to assign the employee to work with the alleged harasser minutes after she complained.

113.    Third, Plaintiff's protected activity and her adverse actions are causally connected. Plaintiff's protected activity against Mr. Epps—complaining in Spring of 2019—is causally

connected to his attack in June of 2019. Then, Plaintiff's protected activity via an internal complaint and FDC and SFRC's adverse assignment of Plaintiff to work with Mr. Epps less than an hour later is causally connected based on temporal proximity.

114.    Defendants took the aforementioned adverse actions against Plaintiff because of his/her protected activities.

115.    As a result of Defendant FDC and Defendant SFRC's unlawful employment practices in violation of FCRA § 760.10(7), Plaintiff has suffered damages.

**COUNT V**
**38 U.S.C. § 4311(b)**
**Military Discrimination – Disparate Treatment**
**(Against Defendants FDC, SFRC, and DeShazior)**

116.    Plaintiff reincorporates the allegations contained in paragraphs 49-64.

117.    USERRA, 38 U.S.C. § 4311(a), provides that:

> (a) A person who is a member of, applies to be a member of, performs, has performed, applies to perform, or has an obligation to perform service in a uniformed service shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership, application for membership, performance of service, application for service, or obligation.

118.    To state a claim of military discrimination, an employee must show she was denied an employment benefit and that her military status was a motivating factor in the adverse action.

119.    Defendant DeShazior purposefully applied incorrect codes on Plaintiff's payroll so her leave would be taken out of her annual leave rather than military leave, which should not have had any affect on her employment as required by USSERA.

120.    On other occasions, Plaintiff would work overtime—involuntarily—and Defendant FCD and Defendant SFRC failed to pay Plaintiff because of her military trainings during that

month.  Consequently, Plaintiff only ever received two overtime paychecks during her five years of employment even though she was entitled to more based on her overtime hours.

121.     Defendant DeShazior would approve days off for Mr. Epps, yet when Plaintiff requested military leave, DeShazior would reduce Plaintiff's military trainings as "excuses" to miss work or otherwise "fake military leave."  Conversely, DeShazior would approve Mr. Epps', requested time off for sick leave without question.

122.     Defendant DeShazior, Defendant FDC and Defendant SFRC treated Plaintiff less favorably than similarly situated, non-military correctional officers because of Plaintiff's military status.  DeShazior assigned Plaintiff to the Detention Center for an entire month, yet never assigned Mr. Epps, Ms. Dixon or Ms. McKay—whatsoever—to the Detention Center notwithstanding policy dictating a rotation as necessary.

123.     Similarly, while DeShazior assigned Ms. Ballate, Ms. Dixon and Ms. McKay to the Control Room, DeShazior never assigned Plaintiff there even though Plaintiff was qualified. Indeed, DeShazior told Plaintiff, "I'm not assigning you there *because you're military*."

124.     Hence, Plaintiff's military status was a motivating factor in the above defendants' disparate treatment of Plaintiff.

125.     As a result of Defendant FDC, Defendant SFRC, and Defendant DeShazior's unlawful employment practices in violation of 38 U.S.C. § 4311(b), Plaintiff has suffered damages.

**COUNT VI**
**38 U.S.C. § 4311(b)**
**Military Discrimination - Retaliation**
**(Against Defendants FDC, SFRC, and DeShazior)**

126.     Plaintiff reincorporates the allegations contained in paragraphs 49-64.

127.     USERRA, 38 U.S.C. § 4311(b), provides that:

(b) An employer may not discriminate in employment against or take any adverse employment action against any person because such person (1) has taken an action to enforce a protection afforded any person under this chapter, (2) has testified or otherwise made a statement in or in connection with any proceeding under this chapter, (3) has assisted or otherwise participated in an investigation under this chapter, or (4) has exercised a right provided for in this chapter. The prohibition in this subsection shall apply with respect to a person regardless of whether that person has performed service in the uniformed services.

128.     Plaintiff took action to enforce USERRA provisions by requesting military leave.

129.     Defendant DeShazior, on behalf of Defendants FDC and SFRC, retaliated against Plaintiff when she requested military leave.   DeShazior would scrutinize Plaintiff about her military leave, calling such leave an "excuse" to miss work, or "fake military leave" even though Plaintiff was and is a dedicated service member who had been taking military leave for years.

130.     Defendant DeShazior purposefully applied incorrect codes on Plaintiff's payroll so Plaintiff's leave would be taken out of her annual leave rather than military leave.  Consequently, Plaintiff only ever received two overtime paychecks throughout her employment.

131.     Upon Plaintiff's return from military service, Defendant DeShazior took a series of adverse actions against Plaintiff.  DeShazior assigned Plaintiff to work in the Detention Center for an entire month, defying policy, while DeShazior never assigned non-military members, including Mr. Epps, Ms. Dixon, or Ms. McKay to the Detention Center.

132.     Consequently, Plaintiff's adverse job assignments not only affected the terms and conditions of her employment, but also had a materially adverse effect outside of the workplace, including the ability to care for her daughter, which DeShazior was well aware.  Specifically, the month-long Detention Center assignment was 15 miles further than Plaintiff's commute to the Hospital—where she would meet her mother before the shift for Plaintiff's daughter to attend daycare.

133.     Similarly, DeShazior did not assign Plaintiff to the Control Room upon her return from military leave even though she was qualified to do so.  DeShazior assigned Ms. Ballate, Ms. Dixon, and Ms. McKay to the Control Room even though Plaintiff was just as qualified.  When Plaintiff asked DeShazior for such assignment, DeShazior said, "I'm not assigning you there because you're military."

134.     Therefore, Defendant DeShazior, Defendant FDC and Defendant SFRC retaliated against Plaintiff because of her military status and because she requested military leave.

135.     As a result of the above defendants' violation of USSERA 38 U.S.C. § 4311(b), Plaintiff has suffered damages.

### COUNT VII
### Battery
### (Against Defendant Epps)

136.     Plaintiff reincorporates the allegations contained in paragraphs in 23-29.

137.     In Florida, battery is the infliction of a harmful or offensive contact upon another with the intent to cause such contact or the apprehension that such contact is imminent.

138.     Defendant Epps' intentional conduct was unlawful because it caused an imminent apprehension in Plaintiff of unwanted sexual contact, and, as explained in greater detail above, and described below, it did in fact result in such contact.

139.     In or around the Spring of 2019, Defendant Epps physically lifted Plaintiff from the ground.  He wrapped his arms around Plaintiff, lifted her up, and said, "I want to show others how strong I am."  On the at least two separate occasions, Defendant Epps reached inside Plaintiff's vest and attempted to grope Plaintiff's breasts.

140.     Defendant Epps made harmful and/or offensive contact with Plaintiff because Plaintiff said, "Stop it—now," as she grabbed Defendant Epps' hand as he groped Plaintiff's breasts.

141.     In or around June of 2019, Defendant Epps grabbed Plaintiff and forcefully pushed her into the breakroom on the 4th floor of the Hospital.  Defendant Epps closed the door, lifted Plaintiff, and placed her on a table.  Then Defendant Epps attempted to kiss Plaintiff against her will.

142.     Defendant Epps made harmful and/or offensive contact with Plaintiff because she said, "Stop it—seriously" as Defendant Epps gripped Plaintiff around her body, with his lips inches away from Plaintiff's face.

143.     On or about January 28, 2020, Defendant Epps pulled Plaintiff into room 318 of the Hospital, shut the door, unzipped his pants, and said, "Do me a favor, Craft."  When Plaintiff attempted to leave, Defendant Epps grabbed Plaintiff by her wrists, pushed her into a corner, and attempted to kiss Plaintiff.

144.     Defendant Epps made harmful and/or offensive contact with Plaintiff because she said, "Get off me, Epps," and then, "Epps, I'm serious, let me go right now!"

145.     To defendant herself, Plaintiff utilized a release tactic to escape Defendant Epps' attack.

146.     Defendant Epps placed Plaintiff in imminent apprehension of sexual contact that were unwanted, offensive, and actually occurred as a result of Defendant Epps' intentional actions.

147.     As a direct and proximate result of Defendant Epps' battery on Plaintiff, Plaintiff has suffered damages.

148.     Defendant Epps' above-described actions were knowing, intentional, willful, malicious, and in reckless disregard of Plaintiff's protected rights to warrant punitive damages under Florida law.

## COUNT VIII
### Assault
### (Against Defendant Epps)

149.     Plaintiff reincorporates the allegations contained in paragraphs in 23-29.

150.     In Florida, assault is an intentional, unlawful offer of corporal injury to another by force, or exertion of force directed toward another under such circumstances as to create a reasonable fear of imminent peril.

151.     Defendant Epps intentionally and unlawfully made an offer of corporal injury to Plaintiff by force, or exertion of force directed toward Plaintiff under such circumstances that created a reasonable fear of imminent peril.

152.     In or around June of 2019, Defendant Epps grabbed Plaintiff and forcefully pushed her into the breakroom on the 4th floor of the Hospital.  Defendant Epps closed the door, lifted Plaintiff, and placed her on a table.  Then Defendant Epps attempted to kiss Plaintiff against her will.

153.     Defendant Epps intentionally and unlawfully offered to make corporal injury upon Plaintiff by force under circumstances which created a reasonable fear of imminent peril in Plaintiff.   Defendant Epps closed the door, lifted Plaintiff on top of the table and then attempted to kiss Plaintiff who said, "Stop it—seriously."

154.     On or about January 28, 2020, Defendant Epps pulled Plaintiff into room 318 of the Hospital, shut the door, unzipped his pants, and said, "Do me a favor, Craft."  When Plaintiff

attempted to leave, Defendant Epps grabbed Plaintiff by her wrists, pushed her into a corner, and attempted to kiss Plaintiff.

155.    Plaintiff was in such fear of imminent peril that she said, "Get off of me, Epps," "Epps, serious, stop!" and, "Epps, I'm serious, let me go right now!"

156.    Ultimately, Plaintiff had to use a release tactic to escape from Defendant Epps.

157.    Hence, the above-described conduct was intentional, and placed Plaintiff in reasonable fear of imminent peril.

158.    As a direct and proximate result of Defendant Epps' assault on Plaintiff, Plaintiff has suffered damages.

159.    Defendant Epps' above-described actions were knowing, intentional, willful, malicious, and in reckless disregard of Plaintiff's protected rights to warrant punitive damages under Florida law.

### COUNT IX
### False Imprisonment
### (Against Defendant Epps)

160.    Plaintiff reincorporates the allegations contained in paragraphs 23-29.

161.    To state a claim for false imprisonment, a plaintiff must show: (1) an unlawful detention and deprivation of the liberty of a person, (2) against that person's will, (3) without legal authority or color of authority, and (4) which is unreasonable and unwarranted under the circumstances.

162.    In or around June of 2019, Defendant Epps willfully acted intending to confine Plaintiff without her consent and without authority of law, causing unreasonable and unwarranted confinement under the circumstances.

163.    Defendant Epps intentionally and unlawfully detained and deprived Plaintiff of her liberty by confining Plaintiff inside the breakroom on the 4th floor.  Defendant Epps had grabbed Plaintiff and forcefully pushed her into the breakroom when no one was looking.  Defendant Epps shut the door.  Defendant Epps detained Plaintiff against her will.  When Defendant Epps approached Plaintiff, and tried to kiss Plaintiff against her will, she said, "Stop it—seriously." Hence, Defendant Morales intentionally confined Plaintiff into the closet against her objection.

164.    On or about January 28, 2020, Defendant Epps intentionally and unlawfully detained and deprived Plaintiff of her liberty by pulling Plaintiff into room 318, shutting the door, and confining Plaintiff against her will.

165.    Defendant Epps shut the door, unzipped his pants, and said, "Do me a favor, Craft." Plaintiff stood up and tried to leave.  Consequently, Defendant Epps grabbed Ms. Craft's wrists, pushed her into a corner and tried to kiss her. Plaintiff said, "Get off of me, Epps."  He would not. "I said, do me a favor, Craft."  Plaintiff said, "Epps, serious, stop!"  Defendant Epps grabbed Plaintiff's wrists tighter and moved his head near Ms. Craft's neck.  Plaintiff said, "Epps, I'm serious, let me go right now!"

166.    Plaintiff was aware of her own confinement because she attempted to escape, ultimately resorting to a release tactic she learned in the military.

167.    Defendant Epps did not have authority by consent or authority of law or even under color of authority.

168.    Defendant Epps' confinement of Plaintiff was unreasonable and unwarranted under the circumstances.   Indeed, pulling Plaintiff into the breakroom and room 318 were both unwarranted and unreasonable.

169.     As a direct and proximate result of Defendant Morales' false imprisonment on Plaintiff, Plaintiff has suffered and will continue to suffer severe and permanent traumatic injuries, including mental, physiological, and emotional damages.

170.     has suffered because of the above-described misconduct perpetrated by Defendant.

**COUNT X**
**42 U.S.C. § 1983**
**Fourteenth Amendment Equal Protection Clause**
**(Against Defendant Epps)**

171.     Plaintiff reincorporates the allegations contained in paragraphs 23-29.

172.     Section 1 of the Fourteenth Amendment prohibits states from depriving persons of "equal protections of the laws," including discrimination and harassment claims by public employees.

173.     Plaintiff had the constitutional right as a public employee to work in an environment free from unrelenting, intentional sex discrimination, including sexual harassment.

174.     Defendant Epps intentionally discriminated against Plaintiff by treating her differently than other employees because of her sex.

175.     Defendants Epps acted under color of law to deprive Plaintiff of her rights secured by the 14th Amendment Equal Protection Clause by intentionally discriminating against Plaintiff because of her sex.

176.     Indeed, any reasonable officer in Defendant Epps' position would understand lifting a correctional officer off the ground, and reaching inside of her vest to squeeze her breasts violated her Fourteenth Amendment rights.  Additionally, any reasonable officer in Defendant Epps' position would know that pushing Plaintiff into a breakroom, lifting her onto a table and attempting to kiss her against her will violated her Fourteenth Amendment Rights.  Further, still, any reasonable officer in Defendant Epps' position should know that confining a correctional

officer in a room, unzipping his pants, and repeatedly demanding, "do me a favor," violated Plaintiff's Fourteenth Amendment Rights—especially when Plaintiff repeatedly said, "stop it— Epps, seriously!" or was so fearful she had to rely on a release tactic to break Epps' stronghold on Plaintiff.

177.    Defendant Epps did not make sexual advances or physical sexually charged attacks against other correctional officers, including Ms. Dixon, Ms. McKay, Ms. Ballate, or Ms. Torres.

178.    The contours of Plaintiff's equal protection rights are clearly established, and sufficiently clear, such that any reasonable state officer would know that sexual harassment would violate Plaintiff's Fourteenth Amendment rights.

179.    Defendant Epps was not acting within his discretionary authority because sexually abusing a coworker does not achieve any job-related goal and is not within the scope of Epps' authority.

180.    The intentional deprivation of Plaintiff's Fourteenth Amendment rights by Defendant Epps were motivated by evil intent, and/or reckless or callous indifference to Plaintiff's federally protected rights, and therefore warrant an award of punitive damages against Defendant Epps.

181.    As a result of Defendant Epps' intentional deprivation of Plaintiff's Fourteenth Amendment Equal Protection rights, in violation of 42 U.S.C. § 1983, Plaintiff has suffered damages.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff demands judgment against Defendants, containing the following relief:

A.      An order directing Defendants to place Plaintiff in the position she would have had but for Defendant's discriminatory, retaliatory and/or otherwise unlawful treatment of Plaintiff.

B.      An award of damages in an amount to be determined at trial, plus prejudgment interest to compensate Plaintiff for all monetary and/or economic damages, including, but not limited to, the loss of past and future income, wages, compensation, job security and other benefits of employment;

C.      An award of damages in an amount to be determined at trial, plus prejudgment interest to compensate Plaintiff for all non-monetary and/or compensatory damages, including but not limited to compensation for her severe mental anguish and emotional distress, humiliation, depression, embarrassment, stress and anxiety, loss of self-esteem, self-confidence, personal dignity, the opportunity to pursue an equal employment opportunity, and emotional pain and suffering and other physical or mental injuries;

D.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to her professional and personal reputation and loss of career fulfillment;

E.      An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff in an amount to be determined at trial, plus prejudgment interest;

F.      Pursuant to FCRA § 760.11(5) and Title VII § 102(b)(3), an award of damages in an amount to be determined at trial, plus prejudgment interest to compensate Plaintiff for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses;

G.      As warranted by FCRA §760.11(5) and Title VII § 102(b)(1), an award of punitive damages for Defendants' engagement in discriminatory practices with malice or with reckless indifference to Plaintiff's rights under federal and state law;

H.      An award of liquidated damages;

I.      Pursuant to FCRA § 760.11(5) and Title VII § 103, an award of costs that Plaintiff has incurred in this Action, as well as Plaintiff's reasonable attorneys' fees plus costs and interest to the fullest extent permitted by law;

J.      Against Defendants FDC, SFRC, and Defendant Epps, pursuant to 42 U.S.C. § 1988, an award of costs that Plaintiff has incurred in this Action, as well as Plaintiff's reasonable attorneys' fees plus costs and interest to the fullest extent permitted by law; and

K.      Such other and further relief the Court deems just and proper.


## JURY DEMAND

Plaintiff Charlotte Craft hereby demands a jury trial of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and Section 102 of the Civil Rights Act of 1991.

Dated: September 2, 2021

Respectfully submitted,

/s/ Caroline H. Miller_____
Caroline H. Miller, Esq.
Fl Bar No. 1012331
**DEREK SMITH LAW GROUP, PLLC**
701 Brickell Ave., Suite 1310
Miami, Florida 33131
Tel: (305) 946-1884
caroline@dereksmithlaw.com
*Attorneys for Plaintiff Charlotte Craft*

33